# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DO NO HARM,
11357 Nuckols Rd., Pmb 115
Glen Allen, VA 23059,

*Plaintiff*,

No. 1:24-cv-03457

v.

SOCIETY OF MILITARY ORTHO-
PAEDIC SURGEONS, d/b/a SOMOS,
110 West Road, Suite 227
Towson, MD 21204;

TELITA CROSLAND, in her official
capacity as Director of the Defense
Health Agency,
7700 Arlington Blvd. Suite 5101
Falls Church, VA 22042;

SEILEEN MULLEN, in her official ca-
pacity as Acting Assistant Secretary of
Defense for Health Affairs,
1000 Defense Pentagon,
Washington, D.C. 20301;

CARLOS DEL TORO, in his official ca-
pacity as Secretary of the Navy,
1000 Navy Pentagon,
Washington, D.C. 20350; and

LLOYD J. AUSTIN III, in his official
capacity as Secretary of Defense,
1000 Defense Pentagon,
Washington, D.C. 20301,

*Defendants*.

# VERIFIED COMPLAINT

1.      Since August 26, 1775, the United States Navy has defended American interests on the high seas and around the world. *The Birth of the U.S. Navy*, U.S. Navy, perma.cc/N23P-C8JB (last visited Dec. 9, 2024).

2.      Among the Navy's core values is "[s]how[ing] respect toward all people without regard to race." *Our Core Values*, U.S. Navy, perma.cc/46FE-3GLE (last visited Dec. 9, 2024). Indeed, the military was one of the first institutions in American government to end segregation. *See* Executive Order 9981 (July 26, 1948) ("[T]here shall be equality of treatment and opportunity for all persons in the armed forces without regard to race, color, religion, or national origin."); Granger et al., *Freedom to Serve: Equality of Treatment and Opportunity in the Armed Forces* 15-31 (1950).

3.      Yet contrary to the Navy's commitment to equality before the law, the military has partnered with SOMOS to implement a race-based service-learning program that discriminates against white, male medical students. *See* Tanner Chaille, *IDEA Grant in Action: SOMOS Scholarship Program Expands Access to Unparalleled Education* (*IDEA in Action*), Am. Acad. of Orthopaedic Surgeons (Oct. 23, 2024), perma.cc/ENV8-JL5K. This program is called the SOMOS E. Anthony Rankin Scholarship Program. *The SOMOS E. Anthony Rankin Scholarship Program* (*Rankin Program*), SOMOS, perma.cc/8M3Q-C7E4 (last visited Dec. 9, 2024).

4.      Founded in 1958 by a group of military officers that included a Navy Captain, SOMOS is a private military orthopaedics society intended to "provide a forum

for the interchange of medical knowledge as it relates to the practice of orthopaedic surgery in the military." *History*, SOMOS, perma.cc/7SU5-KZFH (last visited, Dec. 9, 2024). But today, one of SOMOS's core missions is developing "policy that promotes diversity, equity, and inclusion." SOMOS Bylaws, art. VII, §12 (Dec. 13, 2021), perma.cc/HS6L-RRAA.

5.    The program, which is "meant for underrepresented medical students," matches students with a U.S. military host at either Walter Reed National Military Medical Center or the Naval Medical Center San Diego. *See Rankin Program.* In exchange for agreeing to participate in an up to four-week "immersive experience" at Walter Reed or NMC San Diego, medical students receive up to $12,000 to cover "travel, housing, and daily per diem for the duration" of their time hosted by the military. *Id.*; *see, e.g.*, Jakara Morgan (@JakaraB4MD), Twitter (May 7, 2023, 10:10 PM) (email containing SOMOS's offer to provide a medical student $8,000 in exchange for agreeing to participate in the program), perma.cc/43FJ-88QC.

6.    White males are not "underrepresented." SOMOS's race-based exclusion of them violates §1981's ban on racially discriminatory contracting. And the federal government's partnership with SOMOS flouts the Fifth Amendment and its guarantee of racial equality.

7.    "Racial discrimination is invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 214 (2023) (cleaned up). And "[e]liminating racial discrimination means

2

eliminating all of it." *Harvard*, 600 U.S. at 206. Defendants' program should be declared unlawful and enjoined.

## PARTIES

8.      Plaintiff, Do No Harm, is a nationwide membership organization consisting of healthcare professionals, students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies.

9.      Do No Harm accomplishes its mission through education and advocacy. It has, among other things, sued the federal government for introducing discriminatory "equity" criteria into Medicare, sued private medical organizations for creating racially exclusive fellowships, and filed administrative complaints and lawsuits against medical schools that create fellowships, scholarships, and other benefits that exclude students based on race.

10.     Defendant, SOMOS, is a nonprofit corporation established under the laws of the District of Columbia. SOMOS, supported by its DEI Committee, operates the challenged program, solicits applications for the program, selects (in cooperation with the military) which applicants to offer placements in the program, and distributes funds to medical students in exchange for their agreement to participate in the program's "immersive experience" with the military at Walter Reed or NMC San Diego.

11.     Defendant, Lieutenant General Telita Crosland, is Director of the Defense Health Agency. The DHA "[m]anages authority, direction, and control of military hospitals and clinics worldwide," including Walter Reed and NMC San Diego. *See*

3

*Defense Health Agency—What We Do*, U.S. Mil. Health Sys., perma.cc/347G-KM6K (last visited Dec. 9, 2024). Because Crosland manages Walter Reed and NMC San Diego through the Defense Health Agency, she is responsible for those facilities' policies and practices, including their partnership with SOMOS to implement the challenged program. Crosland is sued in her official capacity.

12.    Defendant, Seileen Mullen, is Acting Assistant Secretary of Defense for Health Affairs. As Acting Assistant Secretary, Mullen "exercises authority, direction, and control through the Defense Health Agency over the DOD medical and dental personnel authorizations and policy, facilities, programs, funding, and other consolidated resources." *Our Organization—Assistant Secretary of Defense for Health Affairs*, U.S. Mil. Health Sys., perma.cc/ECT5-XNHV (last visited Dec. 9, 2024). Mullen is also the "principal advisor to the Secretary of Defense … for all Department of Defense health and force health protection policies, programs, and activities." *Id.* As Crosland's supervisor, Mullen exercises control over the DHA and its components, including Walter Reed and NMC San Diego. She is responsible for those facilities' policies and practices, including their partnership with SOMOS to implement the challenged program. Mullen is sued in her official capacity.

13.    Defendant, Carlos Del Toro, is Secretary of the Navy. As "head of the Department of the Navy," Del Toro "is responsible for, and has the authority necessary to conduct, all affairs of the Department of the Navy." 10 U.S.C. §8013(a)(1), (b). As the Navy's chief civilian officer, Del Toro is responsible for the actions of the Navy

4

personnel at NMC San Diego, including their partnership with SOMOS to implement the challenged program. Del Toro is sued in his official capacity.

14.    Defendant, Lloyd J. Austin III, is Secretary of Defense. As "head of the Department of Defense," Austin exercises "authority, direction, and control over the Department." 10 U.S.C. §§111(b)(7), 113(b). Del Toro's authority over the Department of the Navy is exercised "[s]ubject to [Austin's] authority, direction, and control." *Id.* §8013(b). Likewise, Austin exercises ultimate supervisory authority over Crosland and Mullen in their capacities as Department of Defense officials. *See id.* §113(b). Austin is responsible for U.S. military personnel at Walter Reed and NMC San Diego and for those facilities' policies and practices, including their partnership with SOMOS to implement the challenged program. Austin is sued in his official capacity.

## JURISDICTION AND VENUE

15.    The Court has subject-matter jurisdiction under 28 U.S.C. §1331 because this action arises under the Constitution and laws of the United States.

16.    Venue is proper in D.C. under 28 U.S.C. §1391(e)(1) because all Defendants reside here. SOMOS is incorporated here. *See* SOMOS Bylaws; 28 U.S.C. §1391(c)(2). And the governmental Defendants "'perfor[m] a significant amount of [their] official duties'" here. *McGrone v. Austin*, 2022 WL 888194, at *4 (D.D.C. Mar. 25); *Lamont v. Haig*, 590 F.2d 1124, 1128 n.19 (D.C. Cir. 1978) (explaining that an official capacity defendant's residence under §1391(e)(1) is where the defendant's "official duties are performed").

# FACTUAL ALLEGATIONS

17.    The challenged program was created with the express purpose and design of admitting students by race.

18.    Between July 2021 and July 2022, Lieutenant Commander Marvin Dingle was a Navy orthopaedic surgeon working at Walter Reed. *See* Warren Duffie Jr., *Outstanding Ortho: Naval Stem, Bumed Internship Boosts Diversity in Orthopedic Medicine* (*Outstanding Ortho*), Off. Nav. Rsch. (Aug. 26, 2022), perma.cc/4RWC-GTGJ. Dingle thought the racial composition of the military orthopaedic surgery community was problematic—specifically, the lack of "African Americans." Warren Duffie Jr., *Diverse Perspectives: Naval Stem Touts Outreach Programs at DoD Stem Event* (*Diverse Perspectives*), Off. Nav. Rsch. (Apr. 13, 2023), perma.cc/DV6Q-QZ4H. Dingle thought "'orthopedic surgery is the least diverse field of medicine'" and "'wanted to do something to improve that number.'" *Diverse Perspectives*. Because "'[w]omen and students from underrepresented racial backgrounds are underrepresented in surgical medicine,'" Dingle decided that "'[w]e need more men and women from minority race and gender backgrounds.'" *Outstanding Ortho*.

19.    In 2022, Dingle "conceptualized" a race-based service-learning program designed to begin changing the racial composition of the military orthopaedic surgery community. *Outstanding Ortho*. This "four-week E. Anthony Rankin Orthopaedic Surgery Internship" "target[ed] first- and second-year civilian medical students from underrepresented backgrounds considering careers in orthopedic medicine." *Id.*

20.    The challenged program is also supported by, and run in conjunction with, the federal government.

21.    "Knowing that Naval STEM seeks to support innovative pilot programs in line with the [Navy's] commitment to diversity, equity and inclusion, Dingle submitted a proposal to [the Naval STEM Coordination Office] and received funding to establish the Rankin Internship at Walter Reed." *Outstanding Ortho*; *see also* Dingle et al., *What's Important: Reflections from the 2022 Society of Military Orthopaedic Surgeons (SOMOS) E. Anthony Rankin Scholars* (*Reflections*), 105 J. Bone & Joint Surgery 410, 410, 412 (Mar. 1, 2023) (discussing the origins of the program as a government project), perma.cc/A52G-64MQ.

22.    The deputy director of the Naval STEM Coordination Office, Kathleen Gately Miranda, explained that Dingle's program would "add greater diversity to naval medicine." *Outstanding Ortho*; *see also Reflections*, J. Bone & Joint Surgery at 410.

23.    On top of being funded by the Naval STEM Coordination Office, the program was "managed by the Navy Bureau of Medicine and Surgery." *Outstanding Ortho*; *see also Diverse Perspectives* (same). Dingle served as director of the program and worked with the Bureau to select "six interns from a pool of nearly 80 applicants." *Outstanding Ortho*; *see also Reflections*, 105 J. Bone & Joint Surgery at 412.

24.    The first cohort of medical students that Dingle selected observed and worked with "Walter Reed orthopedic surgeons" and "orthopedic surgeons from the U.S. Naval Academy football team." *Id.* Dingle's race-based program thus was not

possible without SOMOS, the Navy, the Orthopaedic Surgery Department at Walter Reed, Kathleen Miranda (Program Officer of the Naval STEM Coordination Office), and Captain Toni McRae (Diversity Officer of the Navy Bureau of Medicine and Surgery (BUMED)) who secured the necessary funding, much of which came from the Navy. *See Reflections*, 105 J. Bone & Joint Surgery at 412.

25.    The program then expanded, and NMC San Diego joined as a second host site beginning in 2023. *See, e.g.*, Balboa Orthopaedics (@BalboaOrtho), Twitter (June 28, 2023, 11:45 AM) (account run by NMC San Diego's orthopaedic surgery residents congratulating participants in the 2023 cohort and sharing photos from the rotation), perma.cc/DQ35-V25X.

26.    SOMOS has been integrally involved in administering and operating the race-based service-learning program that Dingle created and then successfully pitched to the Navy. Dingle has sat on SOMOS's board of directors as chair of the DEI committee since at least 2021. *See Board of Directors*, SOMOS, perma.cc/MSV8-LX8s, (last visited Dec. 9, 2024); SOMOS (@MilOrtho), Twitter (Dec. 20, 2021, 11:06 AM) (praising Dingle for "lead[ing] from the front" and expressing pride in his service as Chair of the DEI Committee), perma.cc/PCR5-B85C.

27.    From the beginning, SOMOS and Dingle have promoted and solicited applications for the program through SOMOS's website and on social media, often in conjunction with government officials.[1]

28.    To help potential applicants understand the military's expectations for program participants, SOMOS has solicited information from Walter Reed and NMC San Diego about those facilities' orthopaedic surgery rotations. SOMOS shares this information with potential applicants through links on its website. *See Rankin Program; The Walter Reed Orthopaedic Surgery Program: Welcome*, SOMOS, perma.cc/TB3M-8PT3 (last visited Dec. 9, 2024); *NMC San Diego Orthopaedic Surgery Program: Welcome*, SOMOS, perma.cc/QL93-YVX9 (last visited Dec. 9, 2024).

29.    SOMOS (through Dingle and the DEI Committee), and in cooperation with the military, determines which applicants to offer a placement in the program. *See* @JakaraB4MD, Twitter (May 7, 2023, 10:10 PM) (email from Dingle "on behalf of" SOMOS and its board informing student that she has been selected and laying out the terms of SOMOS's service-learning program for her review and acceptance), perma.cc/43FJ-88QC.

30.    SOMOS has also taken steps to grow the program, securing additional funding from the American Academy of Orthopaedic Surgeons. *See AAOS IDEA*

---

[1] *See, e.g.*, Christopher J. Tucker (@ChrisTuckerMD), Twitter (Apr. 18, 2022, 4:54 PM), perma.cc/X7XF-TNMU; *id.* (June 15, 2022, 7:00 PM), perma.cc/M6R7-NMDU; Walter Reed Orthopaedics (@WalterReedOrtho), Twitter (June 15, 2022, 7:07 PM) (account run by Walter Reed orthopaedic surgery residents), perma.cc/77F6-2D5K.

*Grant Program: 2023 IDEA Grant Recipients*, Am. Acad. Orthopaedic Surgeons, perma.cc/VG8U-ZZTY (last visited Dec. 9, 2024) (showing that SOMOS received $32,000 in 2023 IDEA grant funding under Track 1 and Track 4); *AAOS IDEA Grant Program: 2025 IDEA Grant Recipients*, Am. Acad. Orthopaedic Surgeons, perma.cc/QZ8C-J89C (last visited Dec. 9, 2024) (showing $9,600 in 2025 IDEA grant funding under Track 1); *see also IDEA in Action*. These efforts have let SOMOS increase the maximum award to $12,000 and expand the number of participating medical students in each cohort from six to between eight and ten. *See Rankin Program*; *IDEA in Action*.

31.    SOMOS lists the following five criteria for its service-learning program:

   a.    "Medical students at a U.S. MD or DO program";

   b.    "MS1-MS4 students." "*Preference given to MS1 and MS2's*";

   c.    Civilian students (no students who accepted the military's Health Professions Scholarship Program or who are enrolled in the Uniform Services University School of Medicine);

   d.    Identify with an underrepresented gender or racial background in orthopaedics; and

   e.    In good standing with school.

*See Rankin Program.*

32.    SOMOS's fourth criteria excludes white, male applicants.

33.     SOMOS states that the program "is meant for underrepresented medical students to have the opportunity for exposure to orthopaedic surgery in the military setting." *Id.*

34.     The military, too, states that the "purpose of the program" is "to expose underrepresented medical students to the field of orthopaedic surgery in a military setting to advance diversity within orthopaedics." *National Capital Consortium: Orthopaedic Surgery—Mentorship*, U.S. Mil. Health Sys., perma.cc/G7TK-SG6H (last visited Dec. 9, 2024).

35.     Whites are not "underrepresented" in orthopaedic medicine. Whites are also not "diverse," as organizations like SOMOS understand that term.

36.     Dingle, the program's architect, told the military that he created the program because he "wanted to do something to improve [the] number" of "African American orthopedic surgeons in the Navy." *Diverse Perspectives*.

37.     Dingle also told the military that he thought "[w]omen and students from underrepresented racial backgrounds are underrepresented in surgical medicine" and that "[w]e need more men and women from minority race and gender backgrounds to aspire to the medical professions, especially to become orthopedic surgeons." *Outstanding Ortho*.

38.     Dingle's August 2022 article about the inaugural cohort explained that the program "aims to diversify the field of orthopaedics by providing scholarships to gender- and racial minority students." *Reflections*, 105 J. Bone & Joint Surgery at 410. The

same article described the program as the latest in a series of "pipeline programs" that "addres[s] the lack of diversity in the field by providing early exposure for medical students who identify with groups underrepresented in orthopaedic surgery." *Id.* at 412.

39.     Another article states that the program "has allowed for underrepresented students to gain exposure to military orthopaedics and develop mentorships with residents and surgeons with the intent to improve the diversity within the field." Dingle, et al., *Pipeline to Military Orthopaedic Leadership: 20 Years of Race and Gender Diversity Trends Within Military Orthopaedic Surgery Fellowship Training*, 8 J. Bone & Joint Surgery Open Access (Oct. 1, 2023), perma.cc/9474-RHQG. The article expressed hope that pipeline programs like this one could impact the military's racial and gender composition relatively quickly "because the military turns over at a far more rapid pace" than civilian orthopaedics. *Id.*

40.     Dingle has explained that he believes the "[s]tructural proble[m]" of orthopaedic surgery's lack of racial and gender diversity "require[s] structural solutions" that "demand change" and necessitate "tak[ing] prompt deliberate action to set a new course." Dingle et al., *What's Important: The Individualism Excuse and the Myth of Meritocracy in Orthopaedics*, 104 J. Bone & Joint Surgery 1415, 1416 (Aug. 3, 2022), perma.cc/PME4-TR2D; *see also* Dingle et al., *Racial and Gender Diversity of Physicians Accepted to American Military Orthopaedic and Surgical Residencies: An 18-Year Analysis*, J. Bone & Joint Surgery Open Access (Jan. 1, 2023) (concluding that "Orthopaedic surgery training programs in both civilian and military systems suffer from a lack of sexual, ethnic, and racial

diversity" and that "[c]hange will require continued, focused efforts"), perma.cc/Z2BB-MQC8.

41.    Together, these statements render SOMOS's fourth criterion clear: White, male medical students need not apply.

42.    In addition to meeting certain eligibility criteria, SOMOS requires potential participants to apply for the program on its website. *See Rankin Program.*

43.    The application requires:

    a.    Basic contact information;

    b.    The applicant's gender (from a list of Male, Female, Non-binary, and Prefer not to answer);

    c.    The applicant's race (from a list of American Indian or Alaska Native, Asian, Black or African American, Hispanic or Latino, Native Hawaiian and Other Pacific Islander, and White);

    d.    The applicant's curriculum vitae;

    e.    The applicant's half-page minimum personal statement "explaining [their] interest in the scholarship award and how it would benefit them;"

    f.    A letter of good standing from the applicant's medical school; and

    g.    A recent photo.

*See Rankin Program.*

44.    Accepting the scholarship requires no military commitment.

45. Do No Harm has at least one member—Member A—who has been and will continue to be harmed by Defendants' exclusion of white, male medical students from the program.

46. Member A meets each of SOMOS's eligibility criteria except that he is a white male:

    a. Member A is an MS 1 student pursuing an M.D. at an accredited U.S. medical school;

    b. Member A is not an HPSP or USU student; and

    c. Member A is in good standing with his medical school.

47. As an MS 1, Member A has a particular interest in learning about orthopaedic surgery. That he could do so while also helping the nation's military and veteran communities is even more appealing.

48. Member A completed SOMOS's online application well before the 2025 cohort's December 2, 2024, deadline:

    a. Member A entered the required contact information.

    b. Member A identified his degree in progress and his medical school.

    c. Member A identified himself as a white male.

    d. Member A secured a certificate of good standing from his medical school.

    e. Member A created an updated curriculum vitae.

    f. And Member A wrote a personal statement (longer than half a page) explaining his strong desire to pursue a career in orthopaedic surgery, articulating his serious interest in the program and NMC

San Diego, and explaining how participating in the program would benefit him in his future endeavors.

49.    Yet once Member A discovered SOMOS's race-based exclusion of white, male medical students, he was unable to submit his application. Doing so would have been futile—and would be next cycle as well.

50.    Member A is able and ready to apply—and would apply—to the 2025 cohort and any subsequent cohorts while he remains in medical school, and take any necessary subsequent steps (including interviewing) to advance his candidacy, if a court orders Defendants to stop discriminating.

51.    Member A was hurt and dismayed that SOMOS would use his race—which he cannot control—to preclude him from participating in the program and learning from some of the country's most distinguished orthopaedic surgeons in service of our nation's military and veteran communities.

52.    Given the military's history at the forefront of desegregation efforts, Member A is also appalled that the Department of Defense would participate in implementing a racially exclusionary service-learning program.

## CLAIMS FOR RELIEF
## COUNT I
### Violation of Fifth Amendment
### (Against Director Crosland, Acting Assistant Secretary Mullen, Secretary Del Toro, and Secretary Austin)

53.    The Defense Health Agency, Navy, and Department of Defense are subject to the Fifth Amendment. *See Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir.

1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."); *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (similar).

54.    The Fifth Amendment contains an equal-protection principle that binds the federal government and is no less strict than the Equal Protection Clause that binds the States. "[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995). That principle stems not only from the Fifth Amendment, but also from the Fourteenth Amendment's guarantee of equal citizenship, the Constitution's limits on the scope of federal power, and bedrock principles of equality laid out in the Declaration of Independence.

55.    Thus, "whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Id.* at 229-30; *see also Muldrow v. St. Louis*, 601 U.S. 346, 365 (2024) (Kavanaugh, J., concurring in the judgment) (explaining that unlawful discrimination is itself a harm).

56.    The governmental Defendants operate, in partnership with SOMOS, a race-based service-learning program that provides medical students interested in orthopaedic surgery with substantial funding and access to "life-changing" experiences at

some of the nation's foremost military hospitals. But the program excludes white, male applicants.

57.    The program was created with the explicit goal of adjusting the racial composition of the military orthopaedic surgery community. The program creates an explicit racial classification and determines eligibility for participation based on race.

58.    When the government "distributes … benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007).

59.    "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227. The Supreme Court has "insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications." *Johnson v. California*, 543 U.S. 499, 505 (2005). Strict scrutiny is required because "[r]acial classifications raise special fears that they are motivated by an invidious purpose." *Id.* "'Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining … what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.'" *Id.* at 506 *(*cleaned up).

60.    Strict scrutiny is a "searching examination, and it is the government that bears the burden to prove 'that the reasons for any racial classification are clearly identified and unquestionably legitimate.'" *Fisher v. Univ. of Tex.*, 570 U.S. 297, 310 (2013) (cleaned up). The racial classification "must survive a daunting two-step examination." *Harvard*, 600 U.S. at 206. First, the racial classification must "'further compelling

governmental interests.'" *Id.* at 207. Second, the government's use of race must be "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Id.*

61.    The challenged program cannot satisfy strict scrutiny.

62.    Defendants cannot show a compelling governmental interest for excluding white, male medical students from the program. The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances, where those preferences are explicitly designed to remedy recent acts of discrimination and to make the individual subjects of that discrimination whole. *Id.* There is no evidence that the governmental Defendants created the program to remedy some specific past discrimination that they took part in. Instead, Dingle was dissatisfied with the racial composition of the military orthopaedic surgery community. By implementing Dingle's pitch, the governmental Defendants acquiesced to his goal, which is not a compelling interest. Racial balancing—especially in the context of providing an educational service-learning experience to medical students—is patently illegitimate and illegal. *See Brown v. Bd. of Educ.*, 347 U.S. 483, 493-94 (1954); *Harvard*, 600 U.S. at 216-18.

63.    The program is also not narrowly tailored.

64.    The governmental Defendants cannot show that excluding white, male medical students is necessary to achieve any of their interests.

65.    White medical students' race operates as a "negative" by categorically excluding them from the program if they also happen to be male.

66.    The governmental Defendants use race as a stereotype—for example, by proceeding from the assumption that students from racial backgrounds that considered to be "underrepresented in medicine" will not be interested in military orthopaedic surgery unless they are introduced to the specialization as part of a cohort of students that matches their racial makeup.

67.    The governmental Defendants' use of race has no end date. Indeed, the program appears to be growing over time, not winding down.

## COUNT II
### Violation of 42 U.S.C. §1981
### (Against SOMOS)

68.    The program also violates 42 U.S.C. §1981 by intentionally excluding certain medical students from contractual relationships—or at least disfavoring them—because of their race.

69.    Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). The statute prohibits "impairment" of equal contractual rights "by nongovernmental discrimination" and is thus enforceable against private actors like SOMOS. *Id.* §1981(c). Section 1981 authorizes equitable and legal relief, including damages. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975).

70.    Member A is protected by §1981, the "broad terms" of which bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427

19

U.S. 273, 295 (1976). Titled "Equal rights under the law," §1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019), by protecting the "equal right of all persons … to make and enforce contracts without respect to race," *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up).

71.    The program forms a contract. "The term contract, as used in §1981, refers to 'a right in the promisee against the promisor, with a correlative special duty in the promisor to the promisee of rendering the performance promised.'" *Adams v. McDougal*, 695 F.2d 104, 108 (5th Cir. 1983). Put differently, a contract is "'an agreement to do, or refrain from doing, a particular thing, upon sufficient consideration.'" *Am. All. for Equal Rts. v. Fearless Fund Mgmt.*, 103 F.4th 765, 775 (11th Cir. 2024) (quoting 17A Am. Jur. 2d Contracts §1).

72.    Once medical students accept SOMOS's offer to place them at either Walter Reed or NMC San Diego, they agree to complete the program, which requires a commitment to be on site and participate in program activities during the term of the "immersive experience."

73.    Students' commitment to participate also includes a promise to meet the expectations of their military hosts. *See The Walter Reed Orthopaedic Surgery Program: Welcome*; *NMC San Diego Orthopaedic Surgery Program: Welcome*; *see also Naval Medical Center San Diego: Medical Student Rotation Information—Orthopedic Surgery*, U.S. Mil. Health Sys.,

perma.cc/4WBG-GF4G (last visited Dec. 9, 2024) (describing medical students' re-

sponsibilities during an orthopaedic surgery rotation).

74.    In exchange for a student's commitment to participate in the "immersive

experience," SOMOS agrees to pay up to $12,000 to "cover travel, housing, and daily

per diem for the duration of the rotation." *See Rankin Program*; @JakaraB4MD, Twitter

(May 7, 2023, 10:10 PM), perma.cc/43FJ-88QC.

75.    The program separately forms a contract because the selection process

amounts to a contest. SOMOS judges applications on a competitive basis based "on

[students'] academic performance; leadership experience and potential; and efforts to

strengthen diversity, equity and inclusion at their respective medical schools." *Outstand-*

*ing Ortho*; *see also* @JakaraB4MD, Twitter (May 7, 2023, 10:10 PM) (email from SOMOS

explaining that a selected medical student's "application stood out against 125 other

applicants"), perma.cc/43FJ-88QC. This process of "select[ing]" winners based on

"merit" is a "bona fide contest." *Brooklyn Daily Eagle v. Voorhies*, 181 F. 579, 582-83

(C.C.E.D.N.Y. 1910); *accord Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1404-05 (E.D. Cal.

1994) ("answering an essay question" is "a contest"). "A contest is a common example

of a unilateral contract." *Personavera, LLC v. Coll. of Healthcare Info. Mgmt. Execs.*, 2021

WL1313108, at *4 (E.D. Pa. Apr. 8). "[N]early all jurisdictions have adopted the rule

that contract law governs the sponsor-contestant relationship." *Hampton v. Dillard Dep't*

*Stores, Inc.*, 247 F.3d 1091, 1104 (10th Cir. 2001) (cleaned up). SOMOS's program thus

separately implicates the right to "make … contracts." §1981(a).

76.    Section 1981 "protects 'would-be contractor[s]' … to the same extent that it protects contracting parties." *Fearless Fund*, 103 F.4th at 776. The statute broadly "offers relief when racial discrimination blocks the creation of a contractual relationship." *Domino's*, 546 U.S. at 476.

77.    SOMOS's program violates §1981 because it intentionally offers minority students more favorable terms than white students when applying to participate in the program. Medical students with racial backgrounds that SOMOS considers "underrepresented … in orthopaedics" can apply for the program freely. *See Rankin Program*. White students cannot apply at all unless they satisfy the additional requirement of identifying with a gender "underrepresented … in orthopaedics." *Id.* Between two male students, white students are excluded based on their race.

78.    A policy that is "discriminatory on its face" supplies "direct evidence" of discriminatory intent. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). So does "a corporate decision maker's express[ed] desire to avoid" contracting with members of a certain race. *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (cleaned up). Here, there's both. The program's race-based eligibility requirement is "discriminatory on its face," *Thurston*, 469 U.S. 111, 121, because it limits male participation to racial minorities believed to be "underrepresented in medicine." And Dingle (the program's creator, a member of SOMOS's board of directors, and Chair of the DEI Committee that handles SOMOS's end of the selection process) has expressed a "desire to avoid" contracting with students who don't belong to racial groups he considers to be

underrepresented in orthopaedics. *Amini*, 440 F.3d at 359. So Do No Harm "is not required to make any further allegations of discriminatory intent or animus." *Juarez v. Nw. Mut. Life Ins.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014).

79.    Race is a but-for cause of Member A's "'loss of a legally protected right'" to make contracts. *Newman v. Amazon.com, Inc.*, 2022 WL 971297, at *7 (D.D.C. Mar. 31). "So long as the plaintiff's [race] was one but-for cause of that decision, that is enough." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). But for the fact that Member A is white, he would have had the "same right" as "underrepresented" students to apply for the program on equal terms and to "make … contracts" with SOMOS §1981(a). Because Member A is white and happens to also be male, he is ineligible to apply at all.

80.    SOMOS's discrimination cannot survive strict scrutiny. *See Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003). "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227. SOMOS "bears the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fischer*, 570 U.S. at 310 (cleaned up). There is no compelling interest that justifies categorically excluding white, male applicants based on their race. Nor is SOMOS's program narrowly tailored to achieve any compelling interest. A categorical race-based exclusion is, by definition, not narrowly tailored.

81.    SOMOS cannot show that excluding white, male medical students is necessary to achieve any legitimate interest. The only interest that a categorical ban on such

students could conceivably support would be advancing racial balancing in the military orthopaedic surgery community. The Supreme Court has never endorsed such facially unlawful motives.

82.     White medical students' race operates as a "negative" by categorically excluding them from the program unless they happen to be female or somehow otherwise tick SOMOS's "underrepresented gender in orthopaedics" box.

83.     SOMOS uses race as a stereotype—for example, by proceeding from the underlying assumption that promoting racial equity (by which SOMOS means strict racial proportionality) will result in better patient care because orthopaedic surgeons of a given race will be more effective at treating patients of the same race.

84.     SOMOS's use of race has no end date. Indeed, the program appears to be growing over time, not winding down. And everything Dingle has stated or published on the topic indicates that he believes *more race discrimination* (likely substantially more) is necessary to achieve his goals of racial "equity" in the military orthopaedic surgery community.

## PRAYER FOR RELIEF

Wherefore, Plaintiff asks the Court to enter judgment in its favor and against Defendants and to provide relief as follows:

A.     A declaration that the SOMOS E. Anthony Rankin Scholarship Program violates the Fifth Amendment to the U.S. Constitution and 42 U.S.C. §1981.

B.    A permanent injunction barring Defendants from enforcing the program's racial requirement.

C.    If necessary to get relief before the next cycle, a preliminary injunction barring Defendants from enforcing the program's racial requirement.

D.    Nominal damages of $1 against SOMOS.

E.    Reasonable costs and expenses of this action, including attorneys' fees.

F.    And any other relief that the Court may deem just and proper.

Dated:   December 11, 2024                  Respectfully submitted,

_/s/ Cameron T. Norris_____
Thomas R. McCarthy (D.C. Bar #489651)
Cameron T. Norris
  *Lead Counsel*
Frank H. Chang (D.C. Bar #1686578)
Zachary P. Grouev*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
frank@consovoymccarthy.com
zach@consovoymccarthy.com

*application for admission pending

*Counsel for Plaintiff Do No Harm*

# VERIFICATION

I, Kristina Rasmussen, declare as follows:

1.      I am the Executive Director of Do No Harm, the plaintiff in this case.

2.      I have reviewed this complaint.

3.      For the allegations within my personal knowledge, I believe them all to be true.

4.      For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited materials and based on Do No Harm's conversations with its members, including Member A.

5.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 11, 2024

    /s/ Kristina Rasmussen
Kristina Rasmussen
Executive Director of Do No Harm